UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 3144**

| | |
|---|---|
| Altria Group, Inc.,<br><br>                    Plaintiff,<br><br>          v.<br><br>The United States of America,<br><br>                    Defendant. | Case No. _____<br><br>ECF CASE<br><br>**COMPLAINT** |



Plaintiff, Altria Group, Inc. ("Plaintiff"), brings this action against Defendant, the United

States, and respectfully alleges:

## Jurisdiction and Venue

1.       Jurisdiction is conferred upon this Court by 28 U.S.C. § 1346(a)(1) and 26 U.S.C.

§ 7422.

2.       Venue is proper in this Court pursuant to 28 U.S.C. § 1402(a)(2).

## Refund Claimed

3.       This tax refund action, arising under Section 7422 of the Internal Revenue Code

of 1986 (the "Code"), as amended and codified in Title 26 of the United States Code, is brought

against defendant for the recovery of $42,354,829 of Federal income tax erroneously and

illegally assessed against and collected from Plaintiff for Plaintiff's taxable year ended

December 31, 1998 (the "1998 taxable year"), and $60,910,922 of Federal income tax

erroneously and illegally assessed against and collected from Plaintiff for Plaintiff's taxable year

- 1 -

ended December 31, 1999 (the "1999 taxable year"), together with statutory interest thereon as provided by law.

### Parties To This Action

4.    Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Virginia. Plaintiff is a holding company, which during the years at issue in this suit, owned the largest consumer packaged goods business in the world. During the years at issue, Plaintiff's wholly-owned subsidiaries, Philip Morris USA and Philip Morris International and its majority owned subsidiary, Kraft Foods Inc., were engaged in the manufacture and sale of various consumer products, including tobacco, food and beverages. Plaintiff's principal place of business is 120 Park Avenue, New York, NY 10017. Plaintiff's taxpayer identification number is 13-3260245.

5.    Plaintiff is the common parent of an affiliated group of corporations (the "Altria consolidated group") which files a consolidated federal income tax return on a calendar year basis.

6.    Defendant is the United States of America.

### Factual Background

7.    Philip Morris Capital Corporation ("PMCC") is a wholly owned subsidiary of Plaintiff and a member of the Altria consolidated group. Since its incorporation in 1982 and continuing in taxable years 1998 and 1999, PMCC, directly and through its subsidiaries, has engaged in the business of investing in both leveraged leases and direct finance leases of tangible property, as well as in other financing transactions and third-party financial instruments.

8.  Grant Transit Co. ("Grant Transit") is an indirect wholly owned subsidiary of PMCC and a member of the Altria consolidated group.

9.  General Foods Credit Corp. ("GFCC") is a wholly owned subsidiary of PMCC and a member of the Altria consolidated group.

10.  HNB Investment Corp. ("HNB") is a wholly owned subsidiary of PMCC and a member of the Altria consolidated group.

11.  In conjunction with their overall investment business, PMCC, Grant Transit, GFCC, and HNB engaged in various leasing transactions in 1996-1999. With respect to certain of such transactions, the IRS has challenged the tax treatment claimed on the Altria consolidated federal income tax returns. The transactions under challenge involve the following acquisitions:

a.  PMCC acquired an interest in certain property of Oglethorpe Power Corp. (described in ¶¶ 12-42 below);

b.  Grant Transit Co. acquired an interest in certain property of the Metropolitan Transit Authority of New York (described in ¶¶ 43-56 below);

c.  GFCC acquired an interest in certain property of Seminole Electric Cooperative, Inc. (described in ¶¶ 57-80 below);

d.  PMCC acquired an interest in certain property of Watershap Veluwe (described in ¶¶ 81-99 below);

e.  PMCC acquired an interest in certain property of Watershap Vallei En Eeem (described in ¶¶ 100-119 below);

f.  PMCC acquired an interest in certain property of Hoohgemraadschap van Uiterwaterende Sluzen in Holland Noorderkwartier ("USHN") (described in ¶¶ 120-139 below);

g.  PMCC and HNB acquired interests in certain properties of the City of Zurich, Switzerland (described in ¶¶ 140-206 below);

h.  PMCC acquired an interest in certain property of DELTA Netwerk Gas B.V. (described in ¶¶ 207- 218 below)

- 3 -

i.  HNB acquired an interest in certain property of Messe Zurich AG (described in ¶¶ 219-228 below);

j.  PMCC acquired an interest in certain property of Winterthur Life (described in ¶¶ 229-239 below);

k.  PMCC and HNB acquired interests in certain properties of Osterreichische Bundesbahnen ("OBB") (described in ¶¶ 240 - 264 below); and

l.  PMCC and HNB acquired interests in certain property of EDON VAM (described in ¶¶ 265 - 289 below).

## **Oglethorpe Transactions**

12.     In 1996 and 1997, PMCC entered into three transactions through which it acquired ownership interests in certain property of Oglethorpe Power Corp. ("Oglethorpe"). Oglethorpe is an electric cooperative subject to federal and state income tax. Oglethorpe's principal business is providing wholesale electric power to its members.

13.     The Rocky Mountain Pumped Storage Hydroelectric Project is an 848 megawatt pumped storage hydroelectric project located near Rome, Georgia.  The Rocky Mountain Pumped Storage Hydroelectric Project consists of a power plant (the "Rocky Mountain Facility") and associated real property (the "Rocky Mountain Site").

14.     Prior to December 30, 1996, both the Rocky Mountain Facility and the Rocky Mountain Site were jointly owned by Oglethorpe (which owned a 74.61 percent undivided interest) and Georgia Power Co. (which owned a 25.39 percent undivided interest), as tenants in common.

15.     The Rocky Mountain Facility was placed in service during June and July 1995. On December 30, 1996, the remaining useful life of the Rocky Mountain Facility was 59 years.

Oglethorpe P1 Transaction

16.     On December 30, 1996, PMCC, acting through a grantor trust (the trustee of which was Fleet National Bank ("Fleet")), entered into a transaction with Oglethorpe (the "Oglethorpe P1 Transaction").

17.     As a part of the Oglethorpe P1 Transaction, pursuant to the terms of a Head Lease Agreement dated December 30, 1996, PMCC acquired (through title vested in a Georgia trustee, SunTrust Bank ("SunTrust")), a 31.484962406 percent undivided ownership interest (the "Oglethorpe P1 Head Lease Interest") in the Rocky Mountain Facility for the period beginning on December 30, 1996, and ending on November 1, 2067.

18.     On December 30, 1996, as part of the Oglethorpe P1 Transaction, PMCC paid Oglethorpe $335,000,000 in exchange for the Oglethorpe P1 Head Lease Interest (the "Oglethorpe P1 Undivided Interest Cost"). PMCC used $67,000,000 of its own funds to pay a portion of the Oglethorpe P1 Undivided Interest Cost. PMCC used the proceeds of a loan (the "Oglethorpe P1 Loan") from Utrecht America Finance Co. ("Utrecht") in the amount of $268,000,000 to pay the remainder of the Oglethorpe P1 Undivided Interest Cost. Pursuant to the terms of the Oglethorpe P1 Loan, PMCC paid interest to Utrecht in the amounts of $22,522,425 in 1998 and $22,708,104 in 1999.

19.     Because the 71-year term of the Oglethorpe P1 Head Lease Interest significantly exceeded the remaining useful life of the Rocky Mountain Facility as of December 30, 1996, the acquisition of the Oglethorpe P1 Head Lease Interest constituted a sale of an undivided ownership interest in the Rocky Mountain Facility to PMCC for federal income tax purposes. PMCC claimed depreciation deductions with respect to its 31.484962406 percent undivided

ownership interest in the Rocky Mountain Facility in the amounts of $22,393,305 in 1998 and $20,711,044 in 1999.

20.     On December 30, 1996, PMCC, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the Oglethorpe P1 Head Lease to RMLC (the "Oglethorpe P1 Facility Lease"). The Oglethorpe P1 Facility Lease covered the period beginning on December 30, 1996, and ending on January 1, 2027 (the "Oglethorpe P1 Facility Lease Basic Term"). Pursuant to the terms of the Oglethorpe P1 Facility Lease, RMLC was required to make fixed rental payments annually to PMCC (the "Oglethorpe P1 Facility Annual Rent"). Pursuant to the terms of the Oglethorpe P1 Facility Lease, PMCC received Oglethorpe P1 Facility Annual Rent from RMLC in the amounts of $20,246,954 in 1998 and $20,246,954 in 1999.

21.     PMCC incurred certain nonrecurring professional fees and banking charges totaling $4,733,658 in connection with the Oglethorpe P1 Transaction (the "Oglethorpe P1 Transaction Costs").

Oglethorpe P2 Transaction

22.     On January 3, 1997, PMCC, acting through a grantor trust (the trustee of which was Fleet), entered into a second transaction with Oglethorpe (the "Oglethorpe P2 Transaction").

23.     As a part of the Oglethorpe P2 Transaction, pursuant to the terms of a Head Lease Agreement dated January 3, 1997, PMCC acquired (through title vested in a Georgia trustee, SunTrust) a 13.281035794 percent undivided ownership interest (the "Oglethorpe P2 Head Lease Interest") in the Rocky Mountain Facility for the period beginning on January 3, 1997, and ending on November 1, 2067.

24.    As a part of the Oglethorpe P2 Transaction, on January 3, 1997, PMCC paid Oglethorpe $141,310,240 in exchange for the Oglethorpe P2 Head Lease Interest (the "Oglethorpe P2 Undivided Interest Cost"). PMCC used $28,262,048 of its own funds to pay a portion of the Oglethorpe P2 Undivided Interest Cost. PMCC used the proceeds of a loan (the "Oglethorpe P2 Loan") from Utrecht in the amount of $113,048,192 to pay the remainder of the Oglethorpe P2 Undivided Interest Cost. Pursuant to the terms of the Oglethorpe P2 Loan, PMCC paid interest to Utrecht in the amount of $9,477,135 in 1998 and $9,551,925 in 1999.

25.    Because the 71-year term of the Oglethorpe P2 Head Lease Interest significantly exceeded the remaining useful life of the Rocky Mountain Facility as of January 3, 1997, the acquisition of the Oglethorpe P2 Head Lease Interest constituted a sale of an undivided ownership interest in the Rocky Mountain Facility to PMCC for federal income tax purposes. PMCC claimed depreciation deductions in 1998 in the amount of $10,213,270 and in 1999 in the amount of $9,445,980 with respect to its 13.281035794 percent undivided ownership interest in the Rocky Mountain Facility.

26.    On January 3, 1997, PMCC, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the Oglethorpe P2 Head Lease to RMLC (the "Oglethorpe P2 Facility Lease"). The Oglethorpe P2 Facility Lease covered the period beginning on January 3, 1997, and ending on January 1, 2027 (the "Oglethorpe P2 Facility Lease Basic Term"). Pursuant to the terms of the Oglethorpe P2 Facility Lease, RMLC was required to make fixed rental payments annually to PMCC (the "Oglethorpe P2 Facility Annual Rent"). Pursuant to the terms of the Oglethorpe P2 Facility Lease, PMCC received Oglethorpe P2 Facility Annual Rent from RMLC in the amount of $8,560,580 in 1998 and in the amount of $ 8,560,580 in 1999.

27.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $2,013,675 in connection with the Oglethorpe P2 Transaction (the "Oglethorpe P2 Transaction Costs").

Oglethorpe N6 Transaction

28.    On January 3, 1997, Nationsbanc Leasing and R&E Corp. ("Nationsbanc"), acting through a grantor trust (the trustee of which was Fleet) entered into a transaction with Oglethorpe (the "Oglethorpe N6 Transaction").

29.    As a part of the Oglethorpe N6 Transaction, pursuant to the terms of a Head Lease Agreement dated January 3, 1997, Nationsbanc acquired (through title vested in a Georgia trustee, SunTrust) a 7.461 percent undivided ownership interest (the "Oglethorpe N6 Head Lease Interest") in the Rocky Mountain Facility for the period beginning on January 3, 1997, and ending on November 1, 2067.

30.    As a part of the Oglethorpe N6 Transaction, on January 3, 1997, Nationsbanc paid Oglethorpe $79,385,040 in exchange for the Oglethorpe N6 Head Lease Interest (the "Oglethorpe N6 Undivided Interest Cost"). Nationsbanc used $12,591,712 of its own funds to pay a portion of the Oglethorpe N6 Undivided Interest Cost. Nationsbanc used the proceeds of a loan from Utrecht in the amount of $66,793,328 to pay the remainder of the Oglethorpe N6 Undivided Interest Cost.

31.    Because the 71-year term of the Oglethorpe N6 Head Lease Interest significantly exceeded the remaining useful life of the Rocky Mountain Facility as of January 3, 1997, the acquisition of the Oglethorpe N6 Head Lease Interest constituted a sale of an undivided

- 8 -

ownership interest in the Rocky Mountain Facility to Nationsbanc for federal income tax purposes.

32.    On January 3, 1997, Nationsbanc, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the Oglethorpe N6 Head Lease to RMLC (the "Oglethorpe N6 Facility Lease"). The Oglethorpe N6 Facility Lease covered the period beginning on January 3, 1997, and ending on January 1, 2027 (the "Oglethorpe N6 Facility Lease Basic Term"). Pursuant to the terms of the Oglethorpe N6 Facility Lease, RMLC was required to make fixed rental payments annually to Nationsbanc (the "Oglethorpe N6 Facility Annual Rent").

33.    On March 28, 1997, PMCC acquired from Nationsbanc all of Nationsbanc's right, title and interest in the undivided interests Nationsbanc had acquired in the Oglethorpe N6 Transaction. PMCC was assigned all of Nationsbanc's rights pursuant to the terms of all agreements in the Oglethorpe N6 Transaction.

34.    PMCC paid Nationsbanc $79,385,040 in exchange for the Oglethorpe N6 Head Lease Interest (the "Oglethorpe N6 Acquisition Cost"). PMCC used $12,591,712 of its own funds to pay a portion of the Oglethorpe N6 Acquisition Cost. PMCC used the proceeds of a loan from Utrecht (the "Oglethorpe N6 Loan") in the amount of $66,793,328 to pay the remainder of the Oglethorpe N6 Acquisition Cost. Pursuant to the terms of the Oglethorpe N6 Loan, PMCC paid interest to Utrecht in the amount of $5,506,587 in 1998 and $5,567,791 in 1999.

35.    As the assignee of Nationsbanc's interest in the Oglethorpe N6 Head Lease Interest, PMCC claimed depreciation deductions with respect to its 7.461 percent undivided

ownership interest in the Rocky Mountain Facility in the amount of $5,737,594 in 1998 and $5,306,547 in 1999.

36.    Pursuant to the terms of the Oglethorpe N6 Facility Lease, PMCC as assignee of Nationsbanc's interest therein, received Oglethorpe N6 Facility Annual Rent from RMLC in the amount of $4,756,534 in 1998 and $4,756,534 in 1999.

37.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $3,354,003 in connection with the Oglethorpe N6 Transaction (the "Oglethorpe N6 Transaction Costs").

38.    Under Section 61 of the Code, PMCC properly recognized income in the amounts of $33,564,068 in 1998 and $33,564,068 in 1999. Such amounts constitute the total Annual Rent payable for such year pursuant to the terms of the Oglethorpe P1 Facility Lease, the Oglethorpe P2 Facility Lease, and the Oglethorpe N6 Facility Lease.

39.    Under Section 168 of the Code, PMCC properly claimed depreciation deductions in 1998 in the amount of $38,344,169 and in 1999 in the amount of $35,463,571 with respect to its aggregate undivided ownership interest in the Rocky Mountain Facility.

40.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in 1998 in the amount of $364,712 and in 1999 in the amount of $364,712 with respect to the Oglethorpe P1 Transaction Costs, the Oglethorpe P2 Transaction Costs and the Oglethorpe N6 Transaction Costs.

41.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1998 in the amount of $37,506,147 and in 1999 in the amount of $37,827,820 for accrued interest expense with respect to the Oglethorpe P1 Loan, the Oglethorpe P2 Loan and the Oglethorpe N6 Loan.

42.     Plaintiff filed a complaint in this Court with respect to the effect of the Oglethorpe transactions for the 1996 and 1997 taxable years and the IRS's tax treatment of the transactions for those years. That case is currently pending in this Court and has been assigned to Dkt. No. 06-CV-9430 (RJH). This case relates to the IRS's treatment of the transactions for the 1998-1999 tax years.

## MTA Transaction

43.     On March 31, 1997, Grant Transit Co., acting through a grantor trust (the trustee of which was Fleet), entered into a transaction (the "MTA Transaction") with the Metropolitan Transportation Authority of New York ("MTA") and the Triborough Bridge and Tunnel Authority ("TBTA"). MTA is a public benefit corporation of the State of New York. MTA's business is to operate, develop and improve public transportation while implementing a unified public transportation policy in the New York metropolitan area. TBTA is also a public benefit corporation of the State of New York. The business of TBTA is to construct and operate certain vehicular bridges, tunnels and highways, and finance certain other public benefit capital projects.

44.     Prior to March 31, 1997, MTA and its operating subsidiary, the Long Island Railroad ("LIRR"), jointly owned the Hillside Maintenance Complex, a facility located in Hollis, New York. The Hillside Maintenance Complex provides scheduled inspections, running repairs, and overhauls of rolling stock used on the LIRR. The property used in the Hillside Maintenance Complex was placed in service between 1984 and 1991.

45.     As a part of the MTA Transaction, on March 31, 1997, MTA purchased the interest of LIRR in the Hillside Maintenance Facility. Pursuant to the terms of a Head Lease Agreement dated March 31, 1997 (the "MTA Head Lease"), MTA leased the Hillside

- 11 -

Maintenance Facility to TBTA for a basic term (the "MTA Head Lease Basic Term") beginning on March 31, 1997, and ending on January 2, 2019. TBTA has a right to renew the MTA Head Lease for an additional term (the "MTA Head Lease Renewal Term"), beginning on January 2, 2019, and ending on January 2, 2040. Pursuant to the terms of the MTA Head Lease, TBTA was obligated to pay MTA $313,466,200 (the "MTA Head Lease Basic Cost") on March 31, 1997.

46.     On March 31, 1997, TBTA subleased the Hillside Maintenance Complex back to MTA (the "MTA Leaseback") for the period beginning on March 31, 1997, and ending on January 2, 2019 (the "MTA Leaseback Basic Term"). Pursuant to the MTA Leaseback, MTA was obligated to pay TBTA an annual rental for use of the Hillside Maintenance Complex (the "MTA Annual Rent"). MTA sub-subleased the Hillside Maintenance Facility to LIRR.

47.     As a part of the MTA Transaction, TBTA granted a mortgage on the Hillside Maintenance Facility (the "MTA Mortgage") to Utrecht and, pursuant to a loan agreement (the "MTA Loan Agreement"), obtained a loan (the "MTA Loan") from Utrecht in the amount of $267,112,386.

48.     TBTA assigned the proceeds of the MTA Loan to Grant Transit Co. (through Fleet, acting as trustee). TBTA also assigned (through Fleet) all of its right, title and interest in the MTA Leaseback, the MTA Mortgage and the MTA Loan Agreement to Grant Transit Co. Grant Transit Co. (through Fleet) assumed all of TBTA's obligations and liabilities pursuant to the terms of the MTA Leaseback, the MTA Mortgage and the MTA Loan Agreement, including the obligation to pay the MTA Head Lease Basic Cost. Grant Transit Co. became the obligor on the MTA Loan.

49. On March 31, 1997, Grant Transit Co. paid MTA the MTA Head Lease Basic Cost, i.e., $313,466,200. Grant Transit Co. used $47,019,930 of its own funds and the proceeds of the MTA Loan in the amount of $266,446,270 to pay the MTA Head Lease Basic Cost. Grant Transit Co. incurred interest expense with respect to the MTA Loan in 1998 in the amount of $23,665,144 and in 1999 in the amount of $23,864,273.

50. As a part of the MTA Leaseback, MTA paid Grant Transit Co. $21,379,996 in Annual Rent in 1998 and $21,391,882 in 1999.

51. Grant Transit Co. incurred certain nonrecurring professional fees and banking charges totaling $5,186,113 in 1997 in connection with the MTA Transaction (the "MTA Transaction Costs").

52. Under Section 61 of the Code, Grant Transit Co. properly recognized rental income in 1998 in the amount of $21,379,996 and in 1999 in the amount of $21,391,882, the Annual Rental for those years pursuant to the terms of the MTA Leaseback.

53. Under Sections 162 and 178(a) of the Code, Grant Transit Co. is entitled to amortization deductions in 1998 in the amount of $13,721,316 and in 1999 in the amount of $13,721,516 with respect to the MTA Head Lease Basic Cost.

54. Under Section 163 of the Code, Grant Transit Co. is entitled to deductions in 1998 in the amount of $23,665,144 and in 1999 in the amount of $23,864,273 for accrued interest expense with respect to the MTA Loan.

55. Under Section 162 of the Code and Treas. Reg. § 1.162-11, Grant Transit Co. is entitled to amortization deductions in 1998 in the amount of $196,009 and in 1999 in the amount of $196,009 with respect to the MTA Transaction Costs.

- 13 -

56.    Plaintiff filed a complaint in this Court with respect to the effect of the MTA transaction for the 1997 taxable year and the IRS's tax treatment of the transaction for those years. That case is currently pending in this Court and has been assigned to Dkt. No. 06-CV-9430 (RJH). This case relates to the IRS's treatment of the transactions for the 1998-1999 tax years.

## Seminole Transactions

57.    On December 23, 1997, GFCC entered into two transactions through which it acquired ownership interests in certain property of Seminole Electric Cooperative, Inc. ("Seminole"). Seminole is an electric cooperative subject to federal and state income tax. Seminole's principal business is providing wholesale electric power to its members.

58.    The Seminole Generating Plant consists of two 625 megawatt coal-fired electrical generating units (Unit 1 and Unit 2), associated equipment and related leaseholds (the "Seminole Site") located in Palataka, Florida.   Unit 1 and associated equipment were the subject of the transactions between GFCC and Seminole and are hereinafter referred to as the "Seminole Facility."

59.    The Seminole Facility commenced commercial operations in February 1984.  On December 23, 1997, the remaining useful life of the Seminole Facility was 46 years.

60.    In 1982, before the Seminole Facility commenced operations, Seminole entered into a "safe harbor" lease under Section 168(f)(8) of the Code, under which an ownership interest in certain assets used in the Seminole Facility (principally coal handling equipment) was conveyed to Atlantic Richfield Co. and leased back to Seminole for a period of 20 years (the "Atlantic Richfield Safe Harbor Lease"). In 1983, Seminole entered into a second "safe harbor"

- 14 -

lease under Section 168(f)(8) of the Code, in which an ownership interest in certain other assets used in the Seminole Facility (principally electric generation equipment and common facilities) was conveyed to Eastman Kodak Co. and leased back to Seminole for a period of 20 years (the "Kodak Safe Harbor Lease").

Seminole P1 Transaction

61.    On December 23, 1997, GFCC, acting through a grantor trust (the trustee of which was State Street Bank and Trust Company of Connecticut, N.A. ("State Street")), entered into a transaction with Seminole (the "Seminole P1 Transaction").

62.    As a part of the Seminole P1 Transaction, pursuant to the terms of a Head Lease Agreement dated December 23, 1997, GFCC acquired a 34.72222222 percent undivided ownership interest (the "Seminole P1 Head Lease Interest") in the Seminole Facility for the period beginning on December 23, 1997, and ending on January 25, 2053.

63.    The Seminole P1 Head Lease Interest included a 34.72222222 percent undivided interest in Seminole's interest in the property subject to the Atlantic Richfield and Kodak Safe Harbor Leases.  GFCC executed a written consent to take such property subject to the Atlantic Richfield and Kodak Safe Harbor Leases.  Altria and Seminole timely filed the statement required by Treas. Reg. § 5c.168(f)(8)-2(a)(5) with their federal income tax returns for 1997.

64.    As a part of the Seminole P1 Transaction, on December 23, 1997, GFCC paid Seminole $100,000,000 in exchange for the Seminole P1 Head Lease Interest (the "Seminole P1 Basic Rent").  GFCC used $22,353,061 of its own funds to pay a portion of the Seminole P1 Basic Rent.  PMCC used the proceeds of a loan (the "Seminole P1 Loan") from AMBAC AII Corp. ("AMBAC") in the amount of $77,646,939 to pay the remainder of the Seminole P1 Basic

Rent. Pursuant to the terms of the Seminole P1 Loan, GFCC paid interest to AMBAC in the amount of $4,425,678 in 1998 and in the amount of $3,295,374 in 1999.

65.    Because the 55-year term of the Seminole P1 Head Lease Interest significantly exceeded the remaining useful life of the Seminole Facility as of December 23, 1997, the acquisition of the Seminole P1 Head Lease Interest constituted a sale of an undivided ownership interest in the Seminole Facility to GFCC for federal income tax purposes. GFCC claimed depreciation deductions with respect to its 34.72222222 percent undivided ownership interest in the Seminole Facility in the amount of $3,660,470 in 1998 and in the amount of $3,504,569 in 1999.

66.    On December 23, 1997, GFCC, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the Seminole P1 Head Lease to Seminole (the "Seminole P1 Facility Lease"). The Seminole P1 Facility Lease covered the period beginning on December 23, 1997, and ending on January 25, 2020 (the "Seminole P1 Facility Lease Basic Term"). Pursuant to the terms of the Seminole P1 Facility Lease, Seminole was required to make fixed rental payments annually to GFCC (the "Seminole P1 Facility Annual Rent"). Pursuant to the terms of the Seminole P1 Facility Lease, GFCC received Seminole P1 Facility Annual Rent from Seminole in the amount of $3,986,675 in 1998 and in the amount of $4,158,264 in 1999.

67.    GFCC incurred certain nonrecurring professional fees and banking charges totaling $2,550,000 in 1997 in connection with the Seminole P1 Transaction (the "Seminole P1 Transaction Costs").

Seminole P2 Transaction

68.     On December 23, 1997, GFCC, acting through a grantor trust (the trustee of which was State Street), entered into a second transaction with Seminole (the "Seminole P2 Transaction").

69.     As a part of the Seminole P2 Transaction, pursuant to the terms of a Head Lease Agreement dated December 23, 1997, GFCC acquired a 32.98611111 percent undivided ownership interest (the "Seminole P2 Head Lease Interest") in the Seminole Facility for the period beginning on December 23, 1997, and ending on January 25, 2053.

70.     The Seminole P2 Head Lease Interest included a 32.98611111 undivided interest in Seminole's interest in the property subject to the Atlantic Richfield and Kodak Safe Harbor Leases.  GFCC executed a written consent to take such property subject to the Atlantic Richfield and Kodak Safe Harbor Leases.  Altria and Seminole timely filed the statement required by Treas. Reg. § 5c.168(f)(8)-2(a)(5) with their federal income tax returns for 1997.

71.     As a part of the Seminole P2 Transaction, on December 23, 1997, GFCC paid Seminole $95,000,000 in exchange for the Seminole P2 Head Lease Interest (the "Seminole P2 Basic Rent").  GFCC used $21,235,408 of its own funds to pay a portion of the Seminole P2 Basic Rent.  GFCC used the proceeds of a loan (the "Seminole P2 Loan") from AMBAC in the amount of $73,764,592 to pay the remainder of the Seminole P2 Basic Rent.  Pursuant to the terms of the Seminole P2 Loan, GFCC paid interest to AMBAC in the amount of $4,204,394 in 1998 and in the amount of $3,130,606 in 1999.

72.     Because the 55-year term of the Seminole P2 Head Lease Interest significantly exceeded the remaining useful life of the Seminole Facility as of December 23, 1997, the acquisition of the Seminole P2 Head Lease Interest constituted a sale of an undivided ownership

interest in the Seminole Facility to GFCC for federal income tax purposes. GFCC claimed depreciation deductions with respect to its 32.98611111 percent undivided ownership interest in the Seminole Facility in the amount of $3,477,447 in 1998 and in the amount of $3,329,340 in 1999.

73.    On December 23, 1997, GFCC, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the Seminole P2 Head Lease to Seminole (the "Seminole P2 Facility Lease"). The Seminole P2 Facility Lease covered the period beginning on December 23, 1997, and ending on January 25, 2020 (the "Seminole P2 Facility Lease Basic Term"). Pursuant to the terms of the Seminole P2 Facility Lease, Seminole was required to make fixed rental payments annually to GFCC (the "Seminole P2 Facility Annual Rent"). Pursuant to the terms of the Seminole P2 Facility Lease, GFCC received Seminole P2 Facility Annual Rent from Seminole in the amount of $3,787,341 in 1998 and in the amount of $3,950,351 in 1999.

74.    GFCC incurred certain nonrecurring professional fees and banking charges totaling $2,442,500 in 1997 in connection with the Seminole P2 Transaction (the "Seminole P2 Transaction Costs").

75.    Under Section 61 of the Code, GFCC properly recognized income in the amount of $7,774,016 in 1998 and in the amount of $8,108,615 in 1999. Such amount constitutes the total amount of rent payable for such year pursuant to the terms of the Seminole P1 Facility Lease, and the Seminole P2 Facility Lease.

76.     Under Section 168 of the Code, GFCC properly claimed depreciation deductions in 1998 in the amount of $7,774,016 and in 1999 in the amount of $6,833,909 with respect to its aggregate undivided ownership interest in the Seminole Facility.

77.     The transfer of undivided interests in the property subject to the Atlantic Richfield and Kodak Safe Harbor Leases in the Seminole P1 and P2 Transactions is governed by the rules set forth in Treas. Reg. § 5c.168(f)(8)-2(a)(7).  Under that regulation, GFCC is deemed to have acquired a leasehold interest in the property subject to the Atlantic Richfield and Kodak Safe Harbor Leases equal to the remaining lease term thereof, any unpaid obligation of Atlantic Richfield or Kodak arising in connection with the sale of such property by Seminole in the Atlantic Richfield and Kodak safe harbor lease transactions, along with any option of Seminole to purchase such property.  GFCC properly reported interest income with respect to the Atlantic Richfield and Kodak obligations.  GFCC is entitled to a deduction for rent paid pursuant to the terms of the Atlantic Richfield and Kodak Safe Harbor Leases.  GFCC is also entitled to amortization deductions for the portions of the Seminole P1 Basic Rent and the Seminole P2 Basic Rent allocable to the Atlantic Richfield and Kodak leasehold interests.

78.     Under Section 162 of the Code and Treas. Reg. § 1.162-11, GFCC is entitled to amortization deductions in 1998 in the amount of $14,182,975 and in 1999 in the amount of $14,182,975 with respect to the Seminole P1 Transaction Costs and the Seminole P2 Transaction Costs.

79.     Under Section 163 of the Code, GFCC is entitled to a deduction in 1998 in the amount of $4,204,394 and in 1999 in the amount of $3,130,606 for accrued interest expense with respect to the Seminole P1 Loan and the Seminole P2 Loan.

- 19 -

80.    Plaintiff filed a complaint in this Court with respect to the effect of the Seminole transactions for the 1997 taxable year and the IRS's tax treatment of the transactions for those years. That case is currently pending in this Court and has been assigned to Dkt. No. 06-CV-9430 (RJH).

## Veluwe Transaction

81.    In 1997, PMCC entered into a transaction through which it acquired ownership interests in certain property owned by Watershap Veluwe ("Veluwe"). Veluwe is an independent governmental agency (treated as a corporation) organized under the laws of the Netherlands, responsible for the water quantity and quality in its assigned geographic region, including the treatment of wastewater.

82.    Veluwe operates numerous facilities related to water quantity and quality in its assigned region, including three wastewater treatment facilities located in Elburg, Harderwijk, and Hattem, Netherlands, respectively (collectively, the "Veluwe Wastewater Treatment Facilities").

83.    The Elburg Wastewater Treatment Facility was originally placed in service in 1967 and underwent major expansions in 1989 and 1993. On September 30, 1997, the Elburg Wastewater Treatment Facility had a remaining useful life of 58 years.

84.    The Harderwijk Wastewater Treatment Facility was originally placed in service in 1970 and underwent major expansions in 1978 and 1984. On September 30, 1997, the Harderwijk Wastewater Treatment Facility had a remaining useful life of 51 years.

- 20 -

85.    The Hattem Wastewater Treatment Facility was originally placed in service in 1967 and underwent major expansions in 1981 and 1985. On September 30, 1997, the Hattem Wastewater Treatment Facility had a remaining useful life of 51 years.

86.    On September 29, 1997, Veluwe obtained a loan (the "Veluwe Initial Loan") from De Lage Landen Financial Services B.V. ("De Lage Landen"). Veluwe provided a note (the "Veluwe Initial Note") to De Lage Landen in the amount of 168,583,140 Dutch guilders (the equivalent on that date of US$83,481,797). De Lage Landen sold 10 percent of the Veluwe Initial Loan to Foundation Polderland ("Polderland"), a bank unrelated to De Lage Landen. De Lage Landen and Polderland are hereinafter collectively referred to as the "Veluwe Lenders."

87.    On September 30, 1997, PMCC, acting through a grantor trust (the trustee of which was State Street), entered into a transaction with Veluwe (the "Veluwe Transaction").

88.    As a part of the Veluwe Transaction, PMCC acquired an undivided ownership interest in certain personal property used in the Veluwe Wastewater Treatment Facilities. The acquisition was made through a Stille Maatchap (the "Veluwe Lessor"), an entity formed under Netherlands law that is treated as a form of joint ownership for United States tax purposes.

89.    As a part of the Veluwe Transaction, Veluwe contributed a 99.99 percent interest in the Building Right of each of the Veluwe Wastewater Treatment Facilities, subject to the Veluwe Initial Loan, to the Veluwe Lessor in exchange for a 0.01 percent interest in the Veluwe Lessor. Under Dutch law, a Building Right is the ownership for 99 years of all buildings and other non-severable personal property on the premises of each Veluwe Wastewater Treatment Facility. PMCC agreed to assume the obligations of Veluwe to the Veluwe Lenders pursuant to the terms of the Veluwe Initial Loan and the Veluwe Initial Note, in exchange for a 99.99

percent interest in the Veluwe Lessor. In conjunction with the other steps being taken in the Veluwe Transaction, the Veluwe Lenders released Veluwe from its obligations pursuant to the terms of the Veluwe Initial Loan and the Veluwe Initial Note.

90.    As a part of the Veluwe Transaction, PMCC ultimately acquired a 99.99 percent undivided ownership interest in the Building Right of each of the Veluwe Wastewater Treatment Facilities (the "Veluwe Building Rights Interests") in exchange for US$76,552,807. PMCC used US$14,191,905 of its own funds to repay a portion of the Veluwe Initial Loan and thereby pay a portion of the cost of acquisition of the Veluwe Building Rights Interests. PMCC used the proceeds of a loan (the "Veluwe Loan") to pay the remainder of the cost of acquisition of the Veluwe Building Rights Interests. PMCC issued a new note (the "Veluwe Note") in the amount of US$62,360,902 to the Veluwe Lenders. Pursuant to the terms of the Veluwe Loan, PMCC paid interest to the Veluwe Lenders in the amount of US$4,829,505 in 1998 and in the amount of US$5,041,348 in 1999.

91.    Because the 99-year term of the Veluwe Building Rights Interests significantly exceeded the remaining useful life of the Veluwe Wastewater Treatment Facilities as of September 30, 1997, the acquisition of the Veluwe Building Rights Interests constituted a sale of an undivided ownership interest in the Veluwe Wastewater Treatment Facilities to PMCC for federal income tax purposes. PMCC claimed depreciation deductions with respect to its 99.99 percent undivided ownership interest in the Veluwe Wastewater Treatment Facilities in the amount of US$3,142,023 in 1998 and in the amount US$3,142,023 in 1999.

92.    On September 30, 1997, PMCC, as tax owner, leased its undivided ownership interest in the Veluwe Wastewater Treatment Facilities (the "Veluwe Lease") to a commanditaire

- 22 -

vennotshap ("C.V.") (the "Veluwe Partnership"). A C.V. is an entity formed under the laws of the Netherlands that is treated as a limited partnership for United States tax purposes. The partners in the Veluwe Partnership are Veluwe (as limited partner) and its subsidiary, Veluwe Lease Management III B.V. (as general partner).

93.     The Veluwe Lease covered the period beginning on September 30, 1997, and ending on January 2, 2019 (the "Veluwe Lease Basic Term"). Pursuant to the terms of the Veluwe Lease, the Veluwe Partnership was required to make fixed rental payments annually to PMCC (the "Veluwe Annual Rent"). Pursuant to the terms of the Veluwe Lease, PMCC received Veluwe Annual Rent in the amount of US$4,398,495 in 1998 and in the amount of US$4,384,734 in 1999. The Veluwe Partnership subleased the property covered by the Veluwe Lease to Veluwe for a term coextensive with the Veluwe Lease Basic Term.

94.     PMCC incurred certain nonrecurring professional fees and banking charges totaling $573,620 in connection with the Veluwe Transaction (the "Veluwe Transaction Costs").

95.     Under Section 61 of the Code, PMCC properly recognized income in the amount of $4,398,495 in 1998 and in the amount of US$4,384,734 in 1999, representing the total Veluwe Annual Rent paid for that year pursuant to the terms of the Veluwe Lease.

96.     Under Section 168 of the Code, PMCC properly claimed depreciation deductions in 1998 in the amount of $3,142,023 and in 1999 in the amount $3,142,023 with respect to its undivided ownership interest in the Veluwe Wastewater Treatment Facilities.

97.     Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in 1998 in the amount of $21,192 and in 1999 in the amount of $21,192 with respect to the Veluwe Transaction Costs.

- 23 -

98.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1998 in the amount of $4,829,505 and in 1999 in the amount of $5,041,348 for accrued interest expense with respect to the Veluwe Loan.

99.    Plaintiff filed a complaint in this Court with respect to the effect of the Veluwe transaction for the 1997 taxable year and the IRS's tax treatment of the transaction for those years. That case is currently pending in this Court and has been assigned to Dkt. No. 06-CV-9430 (RJH). This case relates to the IRS's treatment of the transactions for the 1998-1999 tax years.

## Vallei Transaction

100.    In 1997, PMCC entered into a transaction through which it acquired ownership interests in certain property owned by Watershap Vallei En Eem ("Vallei"). Vallei is an independent governmental agency (treated as a corporation) organized under the laws of the Netherlands, responsible for the water quantity and quality in its assigned geographic region, including the treatment of wastewater.

101.    Vallei operates numerous facilities related to water quantity and quality in its assigned region, including four wastewater treatment facilities located in Nijkerk, Soest, Veenendaal, and Woudenberg, Netherlands, respectively (collectively, the "Vallei Wastewater Treatment Facilities").

102.    The Nijkerk Wastewater Treatment Facility was originally placed in service in 1964 and was expanded and renovated in 1987.   On September 30, 1997, the Nijkerk Wastewater Treatment Facility had a remaining useful life of 50 years.

103.    The Soest Wastewater Treatment Facility was originally placed in service in 1971, with a major upgrade and expansion in 1997. On September 30, 1997, the Soest Wastewater Treatment Facility had a remaining useful life of 59 years.

104.    The Veenendall Wastewater Treatment Facility was originally placed in service in 1971, with a major upgrade and expansion in 1992. On September 30, 1997, the Veenendaal Wastewater Treatment Facility had a remaining useful life of 55 years.

105.    The Woudenberg Wastewater Treatment Facility was originally placed in service in 1973, with a major upgrade and expansion in 1995. On September 30, 1997, the Woudenberg Wastewater Treatment Facility had a remaining useful life of 58 years.

106.    On September 29, 1997, Vallei obtained a loan (the "Vallei Initial Loan") from De Lage Landen. Vallei provided a note (the "Vallei Initial Note") to De Lage Landen in the amount of 190,680,930 Dutch guilders (the equivalent on that date of US$94,424,547). De Lage Landen sold 10 percent of the Valle Initial Loan to Polderland, a bank unrelated to De Lage Landen. De Lage Landen and Polderland are hereinafter collectively referred to as the "Vallei Lenders."

107.    On September 30, 1997, PMCC, acting through a grantor trust (the trustee of which was State Street), entered into a transaction with Vallei (the "Vallei Transaction").

108.    As a part of the Vallei Transaction, PMCC acquired an undivided ownership interest in certain personal property used in the Vallei Wastewater Treatment Facilities. The acquisition was made through a Stille Maatchap (the "Vallei Lessor"), an entity formed under Netherlands law that is treated as a form of joint ownership for United States tax purposes.

109.    As a part of the Vallei Transaction, Vallei contributed a 99.99 percent interest in the Building Right of each of the Vallei Wastewater Treatment Facilities, subject to the Vallei Initial Loan, to the Vallei Lessor in exchange for a 0.01 percent interest in the Valle Lessor. Under Dutch law, a Building Right is the ownership for 99 years of all buildings and other non-severable personal property on the premises of each Vallei Wastewater Treatment Facility. PMCC agreed to assume the obligations of Vallei to the Vallei Lenders pursuant to the terms of the Vallei Initial Loan and the Initial Note, in exchange for a 99.99 percent interest in the Vallei Lessor. In conjunction with other steps being taken in the Vallei Transaction, the Vallei Lenders released Vallei from its obligations pursuant to the terms of the Vallei Initial Loan and the Vallei Initial Note.

110.    As a part of the Vallei Transaction, PMCC ultimately acquired a 99.99 percent undivided ownership interest in the Building Right of each of the Vallei Wastewater Treatment Facilities (the "Vallei Building Rights Interests") in exchange for US$94,424,547. PMCC used US$16,052,173 of its own funds to repay a portion of the Vallei Initial Loan and thereby pay a portion of the cost of acquisition of the Vallei Building Rights Interests. PMCC used the proceeds of a loan (the "Vallei Loan") to pay the remainder of the cost of acquisition of the Vallei Building Rights Interests. PMCC issued a new note (the "Vallei Note") in the amount of US$78,372,374 to the Vallei Lenders. Pursuant to the terms of the Vallei Loan, PMCC paid interest to the Vallei Lenders in the amount of US$5,462,554 in 1998 and in the amount of $5,702,165 in 1999.

111.    Because the 99-year term of the Vallei Building Rights Interests significantly exceeded the remaining useful life of the Vallei Wastewater Treatment Facilities as of September

30, 1997, the acquisition of the Vallei Building Rights Interests constituted a sale of an undivided ownership interest in the Vallei Wastewater Treatment Facilities to PMCC for federal income tax purposes. PMCC claimed depreciation deductions with respect to its 99.99 percent undivided ownership interest in the Vallei Wastewater Treatment Facilities in the amount of US$3,553,877 in 1998 and in the amount of US$3,553,877 in 1999.

112.    On September 30, 1997, PMCC, as tax owner, leased its undivided ownership interest in the Vallei Wastewater Treatment Facilities (the "Vallei Lease") to a commanditaire vennotshap ("C.V.") (the "Vallei Partnership"). A C.V. is an entity formed under the laws of the Netherlands that is treated as a limited partnership for United States tax purposes. The partners in the Vallei Partnership are Vallei (as limited partner) and its subsidiary, Vallei en Eem Lease Management III B.V. (as general partner).

113.    The Vallei Lease covered the period beginning on September 30, 1997, and ending on January 2, 2019 (the "Vallei Lease Basic Term"). Pursuant to the terms of the Vallei Lease, the Vallei Partnership was required to make fixed rental payments annually to PMCC (the "Vallei Annual Rent"). Pursuant to the terms of the Vallei Lease, PMCC received Vallei Annual Rent in the amount of US$4,975,047 in 1998 and in the amount of US$4,959,483 in 1999. The Vallei Partnership subleased the property covered by the Vallei Lease to Vallei for a term coextensive with the Vallei Lease Basic Term.

114.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $648,811 in connection with the Vallei Transaction (the "Vallei Transaction Costs").

115.    Under Section 61 of the Code, PMCC properly recognized income in 1998 in the amount of $4,975,047 and in 1999 in the amount of $4,959,483, representing the total Vallei Annual Rent paid for that year pursuant to the terms of the Vallei Lease.

116.    Under Section 168 of the Code, PMCC properly claimed depreciation deductions in 1998 in the amount of $3,553,877 and in 1999 in the amount of $3,553,877 with respect to its undivided ownership interest in the Vallei Wastewater Treatment Facilities.

117.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in 1998 in the amount of $23,970 and in 1999 in the amount of $23,970 with respect to the Vallei Transaction Costs.

118.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1998 in the amount of $5,462,554 and in 1999 in the amount of $5,702,165 for accrued interest expense with respect to the Vallei Loan.

119.    Plaintiff filed a complaint in this Court with respect to the effect of the Vallei transaction for the 1997 taxable year and the IRS's tax treatment of the transaction for those years.  That case is currently pending in this Court and has been assigned to Dkt. No. 06-CV-9430 (RJH).  This case relates to the IRS's treatment of the transactions for the 1998-1999 tax years.

## USHN Transaction

120.    In 1997, PMCC entered into a transaction through which it acquired ownership interests in certain property owned by Hoohgeemraadschap van Uitwaterende Sluzen in Hollands Noorderkwartier ("USHN").  USHN is an independent governmental agency (treated as a

corporation) organized under the laws of the Netherlands, responsible for the water quantity and quality in its assigned geographic region, including the treatment of wastewater.

121.    USHN operates numerous facilities related to water quantity and quality in its assigned region, including four wastewater treatment facilities located in De Cocksdorp, Den Helder, Stolpen, and Wieringen, Netherlands, respectively (collectively, the "USHN Wastewater Treatment Facilities").

122.    The De Cocksdorp Wastewater Treatment Facility was originally placed in service in 1981 and was expanded in 1992, 1993 and 1995. On September 30, 1997, the De Cocksdorp Wastewater Treatment Facility had a remaining useful life of 48 years.

123.    The Den Helder Wastewater Treatment Facility was originally placed in service in 1982, with a major upgrade and expansion in 1993 and an expansion in 1995. On September 30, 1997, the Den Helder Wastewater Treatment Facility had a remaining useful life of 56 years.

124.    The Stolpen Wastewater Treatment Facility was originally placed in service in 1979 and was expanded in 1990. On September 30, 1997, the Stolpen Wastewater Treatment Facility had a remaining useful life of 54 years.

125.    The Wieringen Wastewater Treatment Facility was originally placed in service in 1965, with a major upgrade and expansion in 1978 and an expansion in 1995. On September 30, 1997, the Wieringen Wastewater Treatment Facility had a remaining useful life of 46 years.

126.    On September 29, 1997, USHN obtained a loan (the "USHN Initial Loan") from De Lage Landen. USHN provided a note (the "USHN Initial Note") to De Lage Landen in the amount of 81,691,830 Dutch guilders (the equivalent on that date of US$40,453,516). De Lage Landen sold 10 percent of the USHN Initial Loan to Polderland, a bank unrelated to De Lage

Landen. De Lage Landen and Polderland are hereinafter collectively referred to as the "USHN Lenders."

127.    On September 30, 1997, PMCC, acting through a grantor trust (the trustee of which was State Street), entered into a transaction with USHN (the "USHN Transaction").

128.    As a part of the USHN Transaction, PMCC acquired an undivided ownership interest in certain personal property used in the USHN Wastewater Treatment Facilities. The acquisition was made through a Stille Maatchap (the "USHN Lessor"), an entity formed under Netherlands law that is treated as a form of joint ownership for United States tax purposes.

129.    As a part of the USHN Transaction, USHN contributed a 99.99 percent interest in the Building Right of each of the USHN Wastewater Treatment Facilities, subject to the USHN Initial Loan, to the USHN Lessor in exchange for a 0.01 percent interest in the USHN Lessor. Under Dutch law, a Building Right is the ownership for 99 years of all buildings and other non-severable personal property on the premises of each USHN Wastewater Treatment Facility. PMCC agreed to assume the obligations of USHN to the USHN Lenders pursuant to the terms of the USHN Initial Loan and the USHN Initial Note, in exchange for a 99.99 percent interest in the USHN Lessor. In conjunction with other steps being taken in the USHN Transaction, the USHN Lenders released USHN from its obligations pursuant to the terms of the USHN Initial Loan and the USHN Initial Note.

130.    As a part of the USHN Transaction, PMCC ultimately acquired a 99.99 percent undivided ownership interest in the Building Right of each of the USHN Wastewater Treatment Facilities (the "USHN Building Rights Interests") in exchange for US$40,463,516. PMCC used US$6,877,098 of its own funds to repay a portion of the USHN Initial Loan and thereby pay a

portion of the cost of acquisition of the USHN Building Rights Interests. PMCC used the proceeds of a loan (the "USHN Loan") to pay the remainder of the cost of acquisition of the USHN Building Rights Interests. PMCC issued a new note (the "USHN Note") in the amount of US$33,576,418 to the USHN Lenders. Pursuant to the terms of the USHN Loan, PMCC paid interest to the USHN Lenders in the amount of US$2,340,276 in 1998 and in the amount of US$2,442,931 in 1999.

131.    Because the 99-year term of the USHN Building Rights Interests significantly exceeded the remaining useful life of the USHN Wastewater Treatment Facilities as of September 30, 1997, the acquisition of the USHN Building Rights Interests constituted a sale of an undivided ownership interest in the USHN Wastewater Treatment Facilities to PMCC for federal income tax purposes. PMCC claimed depreciation deductions with respect to its 99.99 percent undivided ownership interest in the USHN Wastewater Treatment Facilities in the amount of US$1,522,558 in 1998 and in the amount of US$1,522,558 in 1999.

132.    On September 30, 1997, PMCC, as tax owner, leased its undivided ownership interest in the USHN Wastewater Treatment Facilities (the "USHN Lease") to a commanditaire vennotshap ("C.V.") (the "USHN Partnership"). A C.V. is an entity formed under the laws of the Netherlands that is treated as a limited partnership for United States tax purposes. The partners in the USHN Partnership are USHN (as limited partner) and its subsidiary, USHN Lease Management III B.V. (as general partner).

133.    The USHN Lease covered the period beginning on September 30, 1997, and ending on January 2, 2019 (the "USHN Lease Basic Term"). Pursuant to the terms of the USHN Lease, the USHN Partnership was required to make fixed rental payments annually to PMCC

(the "USHN Annual Rent"). Pursuant to the terms of the USHN Lease, PMCC received USHN Annual Rent in the amount of US$2,131,418 in 1998 and in the amount of US$2,124,750 in 1999. The USHN Partnership subleased the property covered by the USHN Lease to USHN for a term coextensive with the USHN Lease Basic Term.

134.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $277,965 in connection with the USHN Transaction (the "USHN Transaction Costs").

135.    Under Section 61 of the Code, PMCC properly recognized income in 1998 in the amount of $2,131,418 and in 1999 in the amount of $2,124,750, representing the total USHN Annual Rent paid for that year pursuant to the terms of the USHN Lease.

136.    Under Section 168 of the Code, PMCC properly claimed depreciation deductions in 1998 in the amount of $1,522,558 and in 1999 in the amount of $1,522,558 with respect to its undivided ownership interest in the USHN Wastewater Treatment Facilities.

137.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in 1998 in the amount of $10,269 and in 1999 in the amount of $10,269 with respect to the USHN Transaction Costs.

138.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1998 in the amount of $2,340,276 and in 1999 in the amount of $2,442,931 for accrued interest expense with respect to the USHN Loan.

139.    Plaintiff filed a complaint in this Court with respect to the effect of the USHN transaction for the 1997 taxable year and the IRS's tax treatment of the transaction for those years. That case is currently pending in this Court and has been assigned to Dkt. No. 06-CV-

9430 (RJH). This case relates to the IRS's treatment of the transactions for the 1998-1999 tax years.

## City of Zurich Transactions

140.    In 1998, PMCC, acting through various grantor trusts, entered into five transactions with the City of Zurich, Switzerland, through which it acquired ownership interests in certain properties owned by the City of Zurich. Also in 1998, HNB (acting through a grantor trust, the trustee of which was Wilmington Trust Co. ("Wilmington Trust")) entered into a transaction through which it acquired ownership interests in certain properties owned by the City of Zurich.

### VBZ-65 Vehicle Maintenance Facility Transaction

141.    On February 1, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust) entered into a transaction (the "VBZ-65 Transaction") with the City of Zurich, which involved certain maintenance facilities (the "VBZ-65 Maintenance Facility").

142.    The VBZ-65 Maintenance Facility is utilized by Verkehrsbetrieb der Stadt Zurich, an agency charged with providing mass transit rail service to the City of Zurich. The Facility's functions include rail vehicle repair and maintenance, storage, mechanic training and public parking, among others.

143.    Pursuant to the terms of the Head Lease Agreement dated February 1, 1998 (the "VBZ-65 Head Lease"), the City of Zurich leased the VBZ-65 Maintenance Facility to PMCC for a basic term (the "VBZ-65 Head Lease Basic Term") beginning on February 1, 1998, and ending on January 2, 2019. PMCC has a right to renew the lease for an additional term (the

"VBZ-65 Head Lease Renewal Term"), beginning on January 2, 2019, and ending on November 19, 2038.

144.    On February 1, 1998, as part of the VBZ-65 Transaction, PMCC paid the City of Zurich $127,867,570 in exchange for the rights it acquired under the VBZ-65 Head Lease (the "VBZ-65 Head Lease Basic Cost"). PMCC used $23,049,039 of its own funds to pay a portion of the VBZ-65 Head Lease Basic Cost. PMCC used the proceeds of a loan from Credit Suisse First Boston A.G. (the "VBZ-65 Loan") in the amount of $104,818,530 to pay the remainder of the VBZ-65 Head Lease Basic Cost. PMCC incurred interest expense with respect to the VBZ-65 Loan in 1998 in the amount of $6,943,005 and in 1999 in the amount of $7,819,913.

145.    On February 1, 1998, PMCC leased the interest acquired pursuant to the terms of the VBZ-65 Head Lease to the City of Zurich (the "VBZ-65 Leaseback"). The VBZ-65 Leaseback covered the period beginning on February 1, 1998, and ending on January 2, 2019 (the "VBZ-65 Leaseback Basic Term"). Pursuant to the terms of the VBZ-65 Leaseback, the City of Zurich was required make fixed rental payments annually to PMCC (the "VBZ-65 Leaseback Annual Rent").

146.    Pursuant to the terms of the VBZ-65 Leaseback, the City of Zurich paid PMCC VBZ-65 Leaseback Annual Rent in the amount of $6,092,885 in 1998 and $6,112,835 in 1999.

147.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $3,295,556 in connection with the VBZ-65 Transaction (the "VBZ-65 Transaction Costs").

148.    Under Section 61 of the Code, PMCC properly recognized rental income in 1998 in the amount of $6,092,885 and in 1999 in the amount of $6,112,835, the VBZ-65 Leaseback Annual Rent for those years pursuant to the terms of the VBZ-65 Leaseback.

149.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in 1998 in the amount of $5,322,864 and in 1999 in the amount of $5,806,761 with respect to the VBZ-65 Head Lease Basic Cost.

150.    Under Section 163 of the Code, PMCC is entitled to deductions in 1998 in the amount of $6,943,005 and in 1999 in the amount of $7,819,913 for accrued interest expense with respect to the VBZ-65 Loan.

151.    Under section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in the amount of $118,553 in 1998 and in the amount of $129,330 in 1999 (the "VBZ-65 Transaction Costs").

VBZ-67 Transaction

152.    On February 1, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust) entered into a second transaction (the "VBZ-67 Transaction") with the City of Zurich, which involved certain maintenance facilities (the "VBZ-67 Maintenance Facility").

153.    The VBZ-67 Maintenance Facility is a complex comprising an office building, industrial hall and storage garage, which is utilized by Verkehrsbetrieb der Stadt Zurich, an agency charged with providing mass transit rail service to the City of Zurich. The Facility's functions include rail vehicle repair and maintenance, storage, mechanic training and public parking among others.

154.    Pursuant to the terms of a Head Lease Agreement dated February 1, 1998 (the "VBZ-67 Head Lease"), the City of Zurich leased the VBZ-67 Maintenance Facility to PMCC for a basic term (the "VBZ-67 Head Lease Basic Term") beginning on February 1, 1998, and ending on January 2, 2019.  PMCC has a right to renew the lease for an additional term (the "VBZ-67 Head Lease Renewal Term"), beginning on January 2, 2019, and ending on June 25, 2040.

155.    On February 1, 1998, as part of the VBZ-67 Transaction, PMCC paid the City of Zurich $42,144,595 in exchange for the rights it acquired under the VBZ-67 Head Lease (the "VBZ-67 Head Lease Basic Cost").  PMCC used $7,698,061 of its own funds to pay a portion of the VBZ-67 Head Lease Basic Cost.  PMCC used the proceeds of a loan from Credit Suisse First Boston A.G. (the "VBZ-67 Loan") in the amount of $34,446,534 to pay the remainder of the VBZ-67 Head Lease Basic Cost.  PMCC incurred interest expense with respect to the VBZ-67 Loan in 1998 in the amount of $2,281,681 and in 1999 in the amount of $2,570,919.

156.    On February 1, 1998, PMCC leased the interest acquired pursuant to the terms of the VBZ-67 Head Lease to the City of Zurich (the "VBZ-67 Leaseback").  The VBZ-67 Leaseback covered the period beginning on February 1, 1998, and ending on January 2, 2019 (the "VBZ-67 Leaseback Basic Term").  Pursuant to the terms of the VBZ-67 Leaseback, the City of Zurich was required make fixed rental payments annually to PMCC (the "VBZ-67 Leaseback Annual Rent").

157.    Pursuant to the terms of the VBZ-67 Leaseback, the City of Zurich paid PMCC VBZ-67 Leaseback Annual Rent in the amount of $1,990,102 in 1998 and $1,996,619 in 1999.

- 36 -

158.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $1,086,201 in connection with the VBZ-67 Transaction (the "VBZ-67 Transaction Costs").

159.    Under Section 61 of the Code, PMCC properly recognized rental income in 1998 in the amount of $1,990,102 and in 1999 in the amount of $1,996,619, the VBZ-67 Leaseback Annual Rent for those years pursuant to the terms of the VBZ-67 Leaseback.

160.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in 1998 in the amount of $1,745,159 and in 1999 in the amount of $1,903,810 with respect to the VBZ-67 Head Lease Basic Cost.

161.    Under Section 163 of the Code, PMCC is entitled to deductions in 1998 in the amount of $2,281,681 and in 1999 in the amount of $2,570,919 for accrued interest expense with respect to the VBZ-67 Loan.

162.    Under section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in the amount of $38,488 in 1998 and in the amount of $41,987 in 1999 with respect to the VBZ-67 Transaction Costs.

<u>EWZ Transaction</u>

163.    On February 1, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust), entered into a third transaction (the "EWZ Transaction") with the City of Zurich, which involved a general purpose office building (the "EWZ Facility").

164.    The EWZ Facility is a five-story general purpose office building located in Zurich-Oerlikon utilized by Elektrizitatswerk der Stadt Zurich, an agency responsible for providing electric service.

- 37 -

165.    Pursuant to the terms of a Head Lease Agreement dated February 1, 1998 (the "EWZ Head Lease"), the City of Zurich leased the EWZ Facility to PMCC for a basic term (the "EWZ Head Lease Basic Term") beginning on February 1, 1998 and ending on January 2, 2023. PMCC has a right to renew the lease for an additional term (the "EWZ Head Lease Renewal Term") beginning on January 2, 2023 and ending on February 1, 2046.

166.    On February 1, 1998, as part of the EWZ Transaction, PMCC paid the City of Zurich $61,001,043 in exchange for the rights it acquired under the EWZ Head Lease (the "EWZ Head Lease Basic Cost"). PMCC used $10,085,747 of its own funds to pay a portion of the EWZ Head Lease Basic Cost. PMCC used the proceeds of a loan from Credit Suisse First Boston A.G. (the "EWZ Loan") in the amount of $50,915,296 to pay the remainder of the EWZ Head Lease Basic Cost. PMCC incurred interest expense with respect to the EWZ Loan in 1998 in the amount of $3,372,544 and in 1999 in the amount of $3,795,300.

167.    On February 1, 1998, PMCC leased the interest acquired pursuant to the terms of the EWZ Head Lease to the City of Zurich (the "EWZ Leaseback"). The EWZ Leaseback covered the period beginning on February 1, 1998, and ending on January 2, 2023 (the "EWZ Leaseback Basic Term"). Pursuant to the terms of the EWZ Leaseback, the City of Zurich was required make fixed rental payments annually to PMCC (the "EWZ Leaseback Annual Rent").

168.    Pursuant to the terms of the EWZ Leaseback, the City of Zurich paid PMCC EWZ Leaseback Annual Rent in the amount of $2,981,736 in 1998 and $2,991,499 in 1999.

169.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $1,572,192 in connection with the EWZ Transaction (the "EWZ Transaction Costs").

- 38 -

170.    Under Section 61 of the Code, PMCC properly recognized rental income in 1998 in the amount of $2,961,736 and in 1999 in the amount of $2,991,499, the EWZ Leaseback Annual Rent for those years pursuant to the terms of the EWZ Leaseback.

171.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in 1998 in the amount of $3,795,300 and in 1999 in the amount of $2,374,492 with respect to the EWZ Head Lease Basic Cost.

172.    Under Section 163 of the Code, PMCC is entitled to deductions in 1998 in the amount of $3,372,544 and in 1999 in the amount of $3,795,300 for accrued interest expense with respect to the EWZ Loan.

173.    Under section 162 of the Code and Treas. Reg. §1.162-11, PMCC is entitled to amortization deductions in the amount of $47,920 in 1998 and $52,276 in 1999 with respect to the EWZ Transaction Costs.

WVZ Transaction

174.    On February 1, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust), entered into a fourth transaction (the "WVZ Transaction") with the City of Zurich, which involved a general purpose office building (the "WVZ Facility").

175.    The WVZ Facility is a two-story general purpose office building with a separate but linked two-story industrial hall, a parking garage and a storage magazine. The building is located in Zurich-Altstetten and utilized by Wasserversorgung Zurich, an agency responsible for providing potable water to the city.

176.    Pursuant to the terms of a Head Lease Agreement dated February 1, 1998 (the "WVZ Head Lease"), the City of Zurich leased the WVZ Facility to PMCC for a basic term (the

"WVZ Head Lease Basic Term") beginning on February 1, 1998 and ending on January 2, 2021. PMCC has a right to renew the lease for an additional term (the "WVZ Head Lease Renewal Term") beginning on January 2, 2021 and ending on February 1, 2042.

177.    On February 1, 1998, as part of the WVZ Transaction, PMCC paid the City of Zurich $44,101,495 in exchange for the rights it acquired under the WVZ Head Lease (the "WVZ Head Lease Basic Cost"). PMCC used $7,333,820 of its own funds to pay a portion of the WVZ Head Lease Basic Cost. PMCC used the proceeds of a loan from Credit Suisse First Boston A.G. (the "WVZ Loan") in the amount of $36,767,675 to pay the remainder of the WVZ Head Lease Basic Cost. PMCC incurred interest expense with respect to the WVZ Loan in 1998 in the amount of $2,435,429 and in 1999 in the amount of $2,727,718.

178.    On February 1, 1998, PMCC leased the interest acquired pursuant to the terms of the WVZ Head Lease to the City of Zurich (the "WVZ Leaseback"). The WVZ Leaseback covered the period beginning on February 1, 1998, and ending on January 2, 2021 (the "WVZ Leaseback Basic Term"). Pursuant to the terms of the WVZ Leaseback, the City of Zurich was required make fixed rental payments annually to PMCC (the "WVZ Leaseback Annual Rent").

179.    Pursuant to the terms of the WVZ Leaseback, the City of Zurich paid PMCC WVZ Leaseback Annual Rent in the amount of $2,114,209 in 1998 and $2,121,132 in 1999.

180.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $1,136,636 in connection with the WVZ Transaction (the "WVZ Transaction Costs").

181.    Under Section 61 of the Code, PMCC properly recognized rental income in 1998 in the amount of $2,114,209 and in 1999 in the amount of $2,121,132, the WVZ Leaseback Annual Rent for those years pursuant to the terms of the WVZ Leaseback.

- 40 -

182.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in 1998 in the amount of $1,693,292 and in 1999 in the amount of $1,847,228 with respect to the WVZ Head Lease Basic Cost.

183.    Under Section 163 of the Code, PMCC is entitled to deductions in 1998 in the amount of $2,435,429 and in 1999 in the amount of $2,727,718 for accrued interest expense with respect to the WVZ Loan.

184.    Under section 162 of the Code and Treas. Reg. §1.162-11, PMCC is entitled to amortization deductions in the amount of $37,649 in 1998 and $41,071 in 1999 with respect to the WVZ Transaction Costs.

<u>VBZ Bus Depot Transaction</u>

185.    On December 16, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust) entered into a fifth transaction (the "VBZ Bus Depot Transaction") with the City of Zurich, which involved a bus depot (the "VBZ Bus Depot Facility").

186.    The VBZ Bus Depot Facility consists of Aussersihi Bus 6, a bus depot with workshops and office space that is used by Verkehrsbetriebe de Stadt Zurich, the Zurich Transportation Authority.

187.    Pursuant to the terms of a Head Lease Agreement dated December 16, 1998 (the "VBZ Bus Depot Head Lease"), the City of Zurich leased the VBZ Bus Depot Facility to PMCC for a basic term (the "VBZ Bus Depot Head Lease Basic Term") beginning on December 16, 1998 and ending on January 2, 2023. PMCC has a right to renew the lease for an additional term

(the "VBZ Bus Depot Head Lease Renewal Term") beginning on January 2, 2023 and ending on October 4, 2043.

188.    On December 16, 1998, as part of the VBZ Bus Depot Transaction, PMCC paid the City of Zurich $58,692,000 in exchange for the rights it acquired under the VBZ Bus Depot Head Lease (the "VBZ Bus Depot Head Lease Basic Cost"). PMCC used $10,916,712 of its own funds to pay a portion of the VBZ Bus Depot Head Lease Basic Cost. PMCC used the proceeds of a loan from Credit Suisse First Boston A.G. (the "VBZ Bus Depot Loan") in the amount of $47,775,288 to pay the remainder of the VBZ Bus Depot Head Lease Basic Cost. PMCC incurred interest expense with respect to the VBZ Bus Depot Loan in 1998 in the amount of $130,864 and in 1999 in the amount of $3,149,899.

189.    On December 16, 1998, PMCC leased its undivided ownership interest acquired pursuant to the terms of the VBZ Bus Depot Head Lease to the City of Zurich (the "VBZ Bus Depot Leaseback"). The VBZ Bus Depot Leaseback covered the period beginning on December 16, 1998, and ending on January 2, 2023 (the "VBZ Bus Depot Leaseback Basic Term").

190.    Pursuant to the terms of the VBZ Bus Depot Leaseback, the City of Zurich paid PMCC VBZ Bus Depot Leaseback Annual Rent in the amount of $100,889 in 1998 and $2,422,375 in 1999.

191.    PMCC incurred certain nonrecurring professional fees and banking charges in connection with the VBZ Bus Depot Transaction (the "VBZ Bus Depot Transaction Costs").

- 42 -

192.    Under Section 61 of the Code, PMCC properly recognized rental income in 1998 in the amount of $100,889 and in 1999 in the amount of $2,422,375, the VBZ Bus Depot Leaseback Annual Rent for those years pursuant to the terms of the VBZ Bus Depot Leaseback.

193.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in 1998 in the amount of $98,148 and in 1999 in the amount of $2,355,545 with respect to the VBZ Bus Depot Head Lease Basic Cost.

194.    Under Section 163 of the Code, PMCC is entitled to deductions in 1998 in the amount of $130,864 and in 1999 in the amount of $3,149,899 for accrued interest expense with respect to the VBZ Bus Depot Loan.

195.    Under section 162 of the Code and Treas. Reg. §1.162-11, PMCC is entitled to amortization deductions in the amount of $646 in 1998 and $15,496 in 1999 with respect to the VBZ Bus Depot Transaction Costs.

VBZ Tram Transaction

196.    On December 16, 1998, HNB, acting through a grantor trust (the trustee of which was Wilmington Trust) entered into a transaction (the "VBZ Tram Transaction") with the City of Zurich, which involved certain rail storage and maintenance facilities (the "VBZ Tram Facilities").

197.    The VBZ Tram Facilities consist of four rail storage/maintenance facilities used by Verkehrsbetriebe de Stadt Zurich, the Zurich Transportation Authority.

198.    Pursuant to the terms of a Head Lease Agreement dated December 16, 1998 (the "VBZ Tram Head Lease"), the City of Zurich leased the VBZ Tram Facilities to HNB for a basic term (the "VBZ Tram Head Lease Basic Term") beginning on December 16, 1998 and ending on

January 2, 2021. HNB has a right to renew the lease for an additional term (the "VBZ Tram Head Lease Renewal Term") beginning on January 2, 2021, and ending on December 16, 2038.

199.    On December 16, 1998, as part of the VBZ Tram Transaction, HNB paid the City of Zurich $78,240,000 in exchange for the rights it acquired under the VBZ Tram Head Lease (the "VBZ Tram Head Lease Basic Cost"). HNB used $14,513,520 of its own funds to pay a portion of the VBZ Tram Head Lease Basic Cost. HNB used the proceeds of a loan from Credit Suisse First Boston A.G. (the "VBZ Tram Loan") in the amount of $63,726,480 to pay the remainder of the VBZ Tram Head Lease Basic Cost. HNB incurred interest expense with respect to the VBZ Tram Loan in 1998 in the amount of $174,557 and in 1999 in the amount of $4,201,585.

200.    On December 16, 1998, HNB leased the interest acquired pursuant to the terms of the VBZ Tram Head Lease to the City of Zurich (the "VBZ Tram Leaseback"). The VBZ Tram Leaseback covered the period beginning on December 16, 1998, and ending on January 2, 2021 (the "VBZ Tram Leaseback Basic Term"). Pursuant to the terms of the VBZ Tram Leaseback, the City of Zurich was required make fixed rental payments annually to HNB (the "VBZ Tram Leaseback Annual Rent").

201.    Pursuant to the terms of the VBZ Tram Leaseback, the City of Zurich paid HNB VBZ Tram Leaseback Annual Rent in the amount of $135,185 in 1998 and $3,245,884 in 1999.

202.    HNB incurred certain nonrecurring professional fees and banking charges in connection with the VBZ Tram Transaction (the "VBZ Tram Transaction Costs").

- 44 -

203.    Under Section 61 of the Code, HNB properly recognized rental income in 1998 in the amount of $135,185 and in 1999 in the amount of $3,245,884, the VBZ Tram Leaseback Annual Rent for those years pursuant to the terms of the VBZ Tram Leaseback.

204.    Under Sections 162 and 178(a) of the Code, HNB is entitled to amortization deductions in 1998 in the amount of $141,228 and in 1999 in the amount of $3,389,480 with respect to the VBZ Tram Head Lease Basic Cost.

205.    Under Section 163 of the Code, HNB is entitled to deductions in 1998 in the amount of $174,557 and in 1999 in the amount of $4,201,585 for accrued interest expense with respect to the VBZ Tram Loan.

206.    Under section 162 of the Code and Treas. Reg. §1.162-11, HNB is entitled to amortization deductions in the amount of $978 in 1998 and $23,464 in 1999 with respect to the VBZ Tram Transaction Costs.

### Delta Gas

207.    On June 1, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust) entered into a transaction (the "Delta Gas Transaction") with DELTA Netwerk Gas B.V. ("Delta Gas"). Delta Gas is a private company incorporated under the laws of the Netherlands. Delta Gas operates certain gas transmission and distribution networks in the Province of Zeeland, Netherlands.

208.    Prior to June 1, 1998, Delta Gas owned a gas transmission network that consists of six individual transmission networks servicing certain municipalities in the province of Zeeland (the "Delta Gas Networks"). Each of the Delta Gas Networks comprises real and personal property required for the transmission of natural gas to consumers.

- 45 -

209. On June 1, 1998, the remaining useful life of the Delta Gas Network was 60 years.

210. Pursuant to the terms of a Lease Agreement dated June 1, 1998 (the "Delta Gas Head Lease"), PMCC leased the Delta Gas Network for a basic term (the "Delta Gas Head Lease Basic Term") beginning on June 1, 1998, and ending on January 2, 2021. PMCC has the right to renew the Delta Gas Head Lease for an additional term (the "Delta Gas Head Lease Renewal Term"), beginning on January 2, 2021 and ending on October 28, 2036.

211. Pursuant to the terms of the Delta Gas Head Lease, PMCC was obligated to pay Delta Gas $261,751,312 (the "Delta Gas Head Lease Basic Cost") on June 1, 1998 in exchange for the Delta Gas Head Lease Interest. PMCC used $42,792,399 of its own funds to pay a portion of the Delta Gas Head Lease Basic Cost. PMCC used the proceeds of a loan from Hollandsche Bank-Unie N.V. in the amount of $218,958,913 to pay the remainder of the Delta Gas Head Lease Basic Cost.

212. On June 1, 1998, PMCC subleased the Delta Gas Network to Delta Gas (the "Delta Gas Leaseback") for the period beginning on June 1, 1998, and ending on January 2, 2021 (the "Delta Gas Leaseback Basic Term"). Pursuant to the terms of the Delta Gas Leaseback, Delta Gas was obligated to pay PMCC an annual rent for use of the Delta Gas Network (the "Delta Gas Leaseback Annual Rent").

213. Pursuant to the terms of the Delta Gas Leaseback, Delta Gas paid PMCC Delta Gas Leaseback Annual Rent in the amount of $8,093,302 in 1998 and $14,075,308 in 1999.

214.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $4,600,000 in connection with the Delta Gas Transaction (the "Delta Gas Transaction Costs").

215.    Under Section 61 of the Code, PMCC properly recognized rental income in the amounts of $8,093,302 in 1998 and $14,075,308 in 1999 pursuant to the terms of the Delta Gas Leaseback.

216.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in 1998 in the amount of $6,445,220 and in 1999 in the amount of $11,209,078 with respect to the Delta Gas Head Lease Basic Cost.

217.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1998 in the amount of $9,266,341 and in 1999 in the amount of $16,201,888 for accrued interest expense with respect to the Delta Gas Loan.

218.    Under section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in the amount of $93,015 in 1998 and in the amount of $61,766 in 1999 with respect to the Delta Gas Transaction Costs.

## Messe Zurich Transaction

219.    On July 8, 1998, HNB, acting through a grantor trust (the trustee of which was Wilmington Trust) entered into a transaction (the "Messe Zurich Transaction") with Messe Zurich AG ("Messe Zurich"). Messe Zurich is a stock corporation organized under the laws of Switzerland. Messee Zurich operates a trade fair convention center located in Zurich, Switzerland (the "Messe Zurich Property").

- 47 -

220.    As a part of the Messe Zurich Transaction, on July 8, 1998, pursuant to the terms of a Head Lease Agreement (the "Messe Zurich Head Lease"), Messe Zurich leased the Messe Zurich Property to HNB for a basic term (the "Messe Zurich Head Lease Basic Term") beginning on July 8, 1998, and ending on December 2, 2026.  HNB has the right to renew the Messe Zurich Head Lease for an additional term (the "Messe Zurich Head Lease Renewal Term"), beginning on December 2, 2026, and ending on July 8, 2046.  Pursuant to the terms of the Messe Zurich Head Lease, HNB was obligated to pay Messe Zurich $145,169,000 (the "Messe Zurich Head Lease Basic Cost") on July 8, 1998, in exchange for the rights HNB acquired under the Messe Zurich Head Lease.

221.    On July 8, 1998, HNB subleased the Messe Zurich Property to Messe Zurich (the "Messe Zurich Leaseback") for the period beginning on July 8, 1998, and ending on December 2, 2026 (the "Messe Zurich Leaseback Basic Term").  Pursuant to the Messe Zurich Leaseback, Messe Zurich was obligated to pay HNB an annual rental for use of the Messe Zurich Property (the "Messe Zurich Annual Rent").

222.    On July 8, 1998, HNB paid Messe Zurich the Messe Zurich Head Lease Basic Cost, i.e., $145,169,000.  HNB used $21,775,350 of its own funds and the proceeds of a loan (the "Messe Zurich Loan") from Credit Suisse First Boston Aktiengesellschaft  in the amount of $123,393,650 to pay the Messe Zurich Head Lease Basic Cost.  HNB incurred interest expense with respect to the Messe Zurich Loan in the amount of $4,561,460 in 1998 and $9,789,334 in 1999.

223.    Pursuant to the terms of the Messe Zurich Leaseback, Messe Zurich paid to HNB Messe Zurich Annual Rent in the amount of $3,659,495 in 1998 and $7,615,135 in 1999.

224.    HNB incurred certain nonrecurring professional fees and banking charges totaling $3,658,124 in connection with the Messe Zurich Transaction (the "Messe Zurich Transaction Costs").

225.    Under Section 61 of the Code, HNB properly recognized income in the amounts of $3,659,495 in 1998 and $7,615,135 in 1999, representing the total Messe Zurich Annual Rent paid for those years pursuant to the terms of the Messe Zurich Lease.

226.    Under Sections 162 and 178(a) of the Code, HNB properly claimed amortization deductions in 1998 in the amount of $2,474,872 and in 1999 in the amount of $5,150,023 with respect to the Messe Zurich Head Lease Basic Cost.

227.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, HNB is entitled to amortization deductions in 1998 in the amount of $54,872 and in 1999 in the amount of $114,184 with respect to the Messe Zurich Transaction Costs.

228.    Under Section 163 of the Code, HNB is entitled to a deduction in 1998 in the amount of $4,561,460 and in 1999 in the amount of $9,789,334 for accrued interest expense with respect to the Messe Zurich Loan.

### Winterthur Transaction

229.    On September 15, 1998, PMCC, acting through a grantor trust (the trustee of which was Wilmington Trust), entered into a transaction (the "Winterthur Transaction") with Winterthur Life ("Winterthur"). Winterthur is a life insurance company and a Swiss stock corporation.

230.    Prior to September 15, 1998, Winterthur owned a 999/1000 undivided interest in the Galleria Building, which included an undivided interest in the parking garage and certain

land and site improvements (collectively referred to as the "Galleria Building"). The Galleria Building is a general purpose office building located in Opfikon, near Zurich, Switzerland. On September 15, 1998, the Galleria Building was leased to certain tenants. The Galleria Building was constructed between 1988 and 1992.

231.    As a part of the Winterthur Transaction, on September 15, 1998, pursuant to the terms of a Head Lease Agreement (the "Winterthur Head Lease"), Winterthur leased the Galleria Building to PMCC for a basic term (the "Winterthur Head Lease Basic Term") beginning on September 15, 1998, and ending on January 2, 2025. PMCC has a right to renew the Winterthur Head Lease for an additional term (the "Winterthur Head Lease Renewal Term"), beginning on January 2, 2025, and ending on April 25, 2048. Pursuant to the terms of the Winterthur Head Lease, PMCC was obligated to pay Winterthur $196,686,900 (the "Winterthur Head Lease Basic Cost") on September 15, 1998.

232.    On September 15, 1998, PMCC subleased the Galleria Building back to Winterthur (the "Winterthur Leaseback") for the period beginning on September 15, 1998, and ending on January 2, 2025 (the "Winterthur Leaseback Basic Term"). Pursuant to the Winterthur Leaseback, Winterthur was obligated to pay PMCC annual rent for use of the Galleria Building (the "Winterthur Annual Rent").

233.    On September 15, 1998, PMCC paid Winterthur the Winterthur Head Lease Basic Cost, i.e., $196,686,900. PMCC used $ 33,836,430 of its own funds and the proceeds of a loan (the "Winterthur Loan") from Landeskreditbank Baden Wurttemburg ("Landeskreditbank") in the amount of $162,850,469 to pay the Winterthur Head Lease Basic Cost. PMCC incurred

interest expense with respect to the Winterthur Loan in the amount of $ 3,538,741 in 1998 and in the amount of $12,132,540 in 1999.

234.    Pursuant to the terms of the Winterthur Leaseback, PMCC received Winterthur Annual Rent in the amount of $2,683,807 in 1998 and $9,114,816 in 1999.

235.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $1,246,608 in 1998 in connection with the Winterthur Transaction (the "Winterthur Transaction Costs").

236.    Under Section 61 of the Code, PMCC properly recognized rental income in the amount of $2,683,807 in 1998 and in the amount of $9,114,816 in 1999, the Winterthur Annual Rent for those years pursuant to the terms of the Winterthur Leaseback.

237.    Under Sections 162 and 178(a) of the Code, PMCC is entitled to amortization deductions in the amount of $2,136,194 in 1998 and $7,254,998 in 1999 with respect to the Winterthur Head Lease Basic Cost.

238.    Under Section 163 of the Code, PMCC is entitled to deductions in the amount of $3,538,741 in 1998 and $12,132,540 in 1999 for accrued interest expense with respect to the Winterthur Loan.

239.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in the amount of $13,213 in 1998 and $44,874 in 1999 with respect to the Winterthur Transaction Costs.

## OBB Transactions

240.    In 1999, HNB entered into a transaction (the "OBB 1999-1 Transaction") through which it acquired ownership interests in certain property owned by Osterreichische

Bundesbahnen ("OBB"). Also in 1999, PMCC entered into a transaction (the "OBB 1999-2 Transaction") through which it acquired ownership interests in certain property owned by OBB. OBB is a corporation organized under the laws of the Republic of Austria. OBB operates railroad rolling stock, including locomotives and passenger railcars.

241.     The OBB 1999-1 Transaction. On September 2, 1999, HNB, acting through a grantor trust (the trustee of which was State Street), entered into the OBB 1999-1 Transaction. The OBB 1999-1 Transaction involved rolling stock in eight Equipment Lots, EL1, EL2, EL3, EL4, EL5, EL6, EL7, and EL8 (the "OBB 1999-1 Equipment Lots"). The equipment in all of the OBB 1999-1 Equipment Lots is collectively referred to as the "OBB 1999-1 Equipment."

242.     As a part of the OBB 1999-1 Transaction, under eight Equipment Purchase Agreements and Bills of Sale (the "OBB 1999-1 Equipment Purchase Agreements"), each relating to one of the OBB 1999-1 Equipment Lots, HNB acquired an ownership interest in the OBB 1999-1 Equipment. Pursuant to the OBB 1999-1 Equipment Purchase Agreements, OBB agreed to affix by March 2, 2000 a durable and unremovable plate on each piece of OBB 1999-1 Equipment, stating that such equipment was "Property of OBB 1999-1 Trust."

243.     On September 2, 1999, as part of the OBB 1999-1 Transaction, HNB paid OBB $160,492,696 in exchange for the OBB 1999-1 Equipment (the "OBB 1999-1 Equipment Cost"). HNB used $20,864,050 of its own funds to pay a portion of the OBB 1999-1 Equipment Cost. HNB used the proceeds of sixteen loans (collectively, the "OBB 1999-1 Loans") from Creditanstalt AG ("Creditanstalt") in the total amount of $139,628,646 to pay the remainder of the OBB 1999-1 Equipment Cost. The OBB 1999-1 Loans consisted of eight Series A Loans (one for each of the OBB 1999-1 Equipment Lots) in the total amount of $125,665,781 and eight

Series B Loans (one for each of the OBB 1999-1 Equipment Lots) in the total amount of $13,962,865. Pursuant to the terms of the OBB 1999-1 Loans, HNB paid interest to Creditanstalt in the total amount of $3,826,929 in 1999.

244.    HNB claimed depreciation deductions with respect to its ownership interest in the OBB 1999-1 Equipment in the amount of $2,381,531 in 1999.

245.    On September 2, 1999, HNB leased the OBB 1999-1 Equipment to OBB under a Lease Agreement (the "OBB 1999-1 Lease").

246.    The OBB 1999-1 Lease covered the period beginning on September 2, 1999, and ending on the applicable Lease Basic Termination Date for each Equipment Lot (the "OBB 1999-1 Lease Basic Term"). The remaining useful life of the OBB 1999-1 Equipment as of September 2, 1999 significantly exceeded the OBB 1999-1 Lease Basic Term.

247.    Pursuant to the terms of the OBB 1999-1 Lease, OBB was required to make fixed rental payments annually to HNB during the OBB 1999-1 Lease Basic Term (the "OBB 1999-1 Basic Rent"). Pursuant to the terms of the OBB 1999-1 Lease, HNB received OBB 1999-1 Basic Rent in the amount of $1,087,052 in 1999.

248.    HNB incurred certain nonrecurring professional fees and banking charges totaling $3,134,113 in connection with the OBB 1999-1 Transaction (the "OBB 1999-1 Transaction Costs").

249.    Under Section 61 of the Code, HNB properly recognized income in the amount of $1,087,052 in 1999, representing the total OBB 1999-1 Basic Rent paid for that year pursuant to the terms of the OBB 1999-1 Lease.

250.   Under Section 168 of the Code, HNB properly claimed depreciation deductions in 1999 in the amount of $2,381,531 with respect to its ownership interest in the OBB 1999-1 Equipment.

251.   Under Section 162 of the Code and Treas. Reg. § 1.162-11, HNB is entitled to amortization deductions in 1999 in the amount of $32,749 with respect to the OBB 1999-1 Transaction Costs.

252.   Under Section 163 of the Code, HNB is entitled to a deduction in 1999 in the amount of $3,826,929 for accrued interest expense with respect to the OBB 1999-1 Loans.

253.   The OBB 1999-2 Transaction.  On September 2, 1999, PMCC, acting through a grantor trust (the trustee of which was State Street), entered into the OBB 1999-2 Transaction. The OBB 1999-2 Transaction involved rolling stock in four Equipment Lots, EL9, EL10, EL11 and EL12 (the OBB 1999-2 Equipment Lots).  The equipment in all of the OBB 1999-2 Equipment Lots is collectively referred to as the "OBB 1999-2 Equipment."

254.   As part of the OBB 1999-2 Transaction, under eight Equipment Purchase Agreements and Bills of Sale (the "OBB 1999-2 Equipment Purchase Agreements"), each relating to one of the OBB 1999-2 Equipment Lots, PMCC acquired an ownership interest in the OBB 1999-2 Equipment.  Pursuant to the OBB 1999-2 Equipment Purchase Agreements, OBB agreed to affix by March 2, 2000 a durable and unremovable plate on each piece of OBB 1999-2 Equipment, stating that such equipment was "Property of OBB 1999-2 Trust."

255.   On September 2, 1999, as part of the OBB 1999-2 Transaction, PMCC paid OBB $157,334,560 in exchange for the OBB 1999-2 Equipment (the "OBB 1999-2 Equipment Cost"). PMCC used $20,654,355 of its own funds to pay a portion of the OBB 1999-2 Equipment Cost.

- 54 -

PMCC used the proceeds of eight loans (collectively, the "OBB 1999-2 Loans") from Creditanstalt in the total amount of $136,680,205 to pay the remainder of the OBB 1999-2 Equipment Cost. The OBB 1999-2 Loans consisted of four Series A Loans (one for each of the OBB 1999-2 Equipment Lots) in the total amount of $123,012,185 and four Series B Loans (one for each of the OBB 1999-2 Equipment Lots) in the total amount of $13,668,020. Pursuant to the terms of the OBB 1999-2 Loans, PMCC paid interest to Creditanstalt in the total amount of $3,788,466 in 1999.

256.    PMCC claimed depreciation deductions with respect to its ownership interest in the OBB 1999-2 Equipment in the amount of $2,391,437 in 1999.

257.    On September 2, 1999, PMCC, as tax owner, leased the OBB 1999-2 Equipment to OBB under a Lease Agreement (the "OBB 1999-2 Lease").

258.    The OBB 1999-2 Lease covered the period beginning on September 2, 1999, and ending on the applicable Lease Basic Termination Date for each Equipment Lot (the "OBB 1999-2 Lease Basic Term"). The remaining useful life of the OBB 1999-2 Equipment as of September 2, 1999 signifcantly exceeded the OBB 1999-2 Lease Basic Term.

259.    Pursuant to the terms of the OBB 1999-2 Lease, OBB was required to make fixed rental payments annually to PMCC during the OBB 1999-2 Lease Basic Term (the "OBB 1999-2 Basic Rent"). Pursuant to the terms of the OBB 1999-2 Lease, PMCC received OBB 1999-2 Basic Rent in the amount of $993,620 in 1999.

260.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $3,275,136 in connection with the OBB 1999-2 Transaction (the "OBB 1999-2 Transaction Costs").

261.    Under Section 61 of the Code, PMCC properly recognized income in the amount of $993,620 in 1999, representing the total OBB 1999-2 Basic Rent paid for that year pursuant to the terms of the OBB 1999-2 Lease.

262.    Under Section 168 of the Code, PMCC properly claimed depreciation deductions in 1999 in the amount of $2,391,437 with respect to its ownership interest in the OBB 1999-2 Equipment.

263.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in 1999 in the amount of $35,679 with respect to the OBB 1999-2 Transaction Costs.

264.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1999 in the amount of $3,788,466 for accrued interest expense with respect to the OBB 1999-2 Loans.

### EDON Transactions

265.    In 1999, PMCC entered into a transaction through which it acquired an undivided ownership interest in certain property owned by N.V. VAM and leased to VAMIJ C.V. (until April 2000) and VAM Leasing I B.V. (after April 2000) (collectively referred to as "EDON VAM") (the "EDON 1999-1 Transaction"). Also in 1999, PMCC entered into a transaction through which it acquired an undivided ownership interest in certain property owned by N.V. VAM and leased to VAMIJ C.V. (until April 2000) and VAM Leasing II B.V. (after April 2000) (also collectively referred to as "EDON VAM") (the "EDON 1999-2 Transaction"). N.V. VAM is a corporation organized under the laws of the Netherlands. EDON VAM operates a facility (the "EDON Facility"), located at Wijster, the Netherlands, which converts municipal waste to electricity.

266.    The EDON 1999-1 Transaction.  On September 30, 1999, PMCC, acting through a grantor trust (the trustee of which was State Street), entered into the EDON 1999-1 Transaction.

267.    As part of the EDON 1999-1 Transaction, pursuant to the terms of the VAMIJ 1999-1 Deed dated September 30, 1999, PMCC acquired a 50 percent undivided ownership interest (the "EDON 1999-1 Undivided Interest") in the EDON Facility for the period beginning on September 30, 1999 and ending on September 30, 2149, a period of 150 years.

268.    On September 30, 1999, as part of the EDON 1999-1 Transaction, PMCC paid EDON VAM $230,000,000 in exchange for the EDON 1999-1 Undivided Interest (the "EDON 1999-1 Undivided Interest Cost").  PMCC used $34,500,000 of its own funds to pay a portion of the EDON 1999-1 Undivided Interest Cost.  PMCC used the proceeds of two loans, the "EDON 1999-1 Series A Loan" from AIG-FP Funding (Cayman) Ltd. ("AIG") in the amount of $175,950,000 and the "EDON 1999-1 Series B Loan" from Landesbank Sachsen Girozentrale ("Landesbank Sachsen") in the amount of $19,550,000 to pay the remainder of the EDON 1999-1 Undivided Interest Cost.  (The EDON 1999-1 Series A Loan and the EDON 1999-1 Series B Loan are collectively referred to as the "EDON 1999-1 Loans.")  Pursuant to the terms of the EDON 1999-1 Loans, PMCC paid interest to AIG and Landesbank Sachsen in the total amount of $3,543,275 in 1999.

269.    Because the 150-year term of the EDON 1999-1 Undivided Interest significantly exceeded the remaining useful life of the EDON Facility as of September 30, 1999, the acquisition of the EDON 1999-1 Undivided Interest constituted a sale of an undivided ownership interest in the EDON Facility to PMCC for federal income tax purposes.  PMCC claimed

depreciation deductions with respect to its undivided ownership interest in the EDON Facility in the amount of $3,887,675 in 1999.

270.    On September 30, 1999, PMCC, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the VAMIJ 1999-1 Deed to VAMIJ C.V. and VAM Leasing I B.V. under a Lease Agreement (the "EDON 1999-1 Lease").

271.    The EDON 1999-1 Lease covered the period beginning on September 2, 1999, and ending on December 31, 2022 (the "EDON 1999-1 Lease Term"). The remaining useful life of the EDON Facility as of September 30, 1999 significantly exceeded the EDON 1999-1 Lease Term.

272.    Pursuant to the terms of the EDON 1999-1 Lease, EDON was required to make fixed rental payments annually to PMCC during the EDON 1999-1 Lease Term (the "EDON 1999-1 Base Rent"). Pursuant to the terms of the EDON 1999-1 Lease, PMCC received EDON 1999-1 Base Rent in the amount of $36,947 in 1999.

273.    PMCC incurred certain nonrecurring professional fees and banking charges totaling $2,530,000 in connection with the EDON 1999-1 Transaction (the "EDON 1999-1 Transaction Costs").

274.    Under Section 61 of the Code, PMCC properly recognized income in the amount of $36,947 in 1999, representing the total EDON 1999-1 Base Rent paid for that year pursuant to the terms of the EDON 1999-1 Lease.

275.    Under Section 168 of the Code, PMCC properly claimed depreciation deductions in 1999 in the amount of $3,887,675 with respect to its undivided ownership interest in the EDON Facility.

276.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, PMCC is entitled to amortization deductions in 1999 in the amount of $22,255 with respect to the EDON 1999-1 Transaction Costs.

277.    Under Section 163 of the Code, PMCC is entitled to a deduction in 1999 in the amount of $3,543,275 for accrued interest expense with respect to the EDON 1999-1 Loans.

278.    The EDON 1999-2 Transaction.  On September 30, 1999, HNB, acting through a grantor trust (the trustee of which was State Street), entered into the EDON 1999-2 Transaction.

279.    As a part of the EDON 1999-2 Transaction, pursuant to the terms of the VAMIJ 1999-2 Deed dated September 30, 1999, HNB acquired a 50 percent undivided ownership interest (the "EDON 1999-2 Undivided Interest") in the EDON Facility for the period beginning on September 30, 1999 and ending on September 30, 2149, a period of 150 years.

280.    On September 30, 1999, as part of the EDON 1999-2 Transaction, HNB paid EDON VAM $230,000,000 in exchange for the EDON 1999-2 Undivided Interest (the "EDON 1999-2 Undivided Interest Cost").  HNB used $34,500,000 of its own funds to pay a portion of the EDON 1999-2 Undivided Interest Cost.  HNB used the proceeds of two loans the "EDON 1999-2 Series A Loan" from AIG-FP Funding (Cayman) Ltd. ("AIG") in the amount of $175,950,000 and the "EDON 1999-2 Series B Loan" from Landesbank Sachsen Girozentrale ("Landesbank Sachsen") in the amount of $19,550,000 to pay the remainder of the EDON 1999-2 Undivided Interest Cost.  (The EDON 1999-2 Series A Loan and the EDON 1999-2 Series B Loan are collectively referred to as the "EDON 1999-2 Loans.")  Pursuant to the terms of the EDON 1999-2 Loans, HNB paid interest to AIG and Landesbank Sachsen in the total amount of $3,543,275 in 1999.

281.    Because the 150-year term of the EDON 1999-2 Undivided Interest significantly exceeded the remaining useful life of the EDON Facility as of September 30, 1999, the acquisition of the EDON 1999-2 Undivided Interest constituted a sale of an undivided ownership interest in the EDON Facility to HNB for federal income tax purposes.  HNB claimed depreciation deductions with respect to its undivided ownership interest in the EDON Facility in the amount of $3,887,675 in 1999.

282.    On September 30, 1999, HNB, as tax owner, leased its undivided ownership interest acquired pursuant to the terms of the VAMIJ 1999-2 Deed to VAMIJ C.V. and VAM Leasing II B.V. under a Lease Agreement (the "EDON 1999-2 Lease").

283.    The EDON 1999-2 Lease covered the period beginning on September 2, 1999, and ending on December 31, 2022 (the "EDON 1999-2 Lease Term").  The remaining useful life of the EDON Facility as of September 30, 1999 significantly exceeded the EDON 1999-2 Lease Term.

284.    Pursuant to the terms of the EDON 1999-2 Lease, EDON was required to make fixed rental payments annually to HNB during the EDON 1999-2 Lease Term (the "EDON 1999-2 Base Rent").  Pursuant to the terms of the EDON 1999-2 Lease, HNB received EDON 1999-2 Base Rent in the amount of $36,947 in 1999.

285.    HNB incurred certain nonrecurring professional fees and banking charges totaling $2,530,000 in connection with the EDON 1999-2 Transaction (the "EDON 1999-2 Transaction Costs").

286.    Under Section 61 of the Code, HNB properly recognized income in the amount of $36,947 in 1999, representing the total EDON 1999-2 Base Rent paid for that year pursuant to the terms of the EDON 1999-2 Lease.

287.    Under Section 168 of the Code, HNB properly claimed depreciation deductions in 1999 in the amount of $3,887,675 with respect to its undivided ownership interest in the EDON Facility.

288.    Under Section 162 of the Code and Treas. Reg. § 1.162-11, HNB is entitled to amortization deductions in 1999 in the amount of $22,255 with respect to the EDON 1999-2 Transaction Costs.

289.    Under Section 163 of the Code, HNB is entitled to a deduction in 1999 in the amount of $3,543,275 for accrued interest expense with respect to the EDON 1999-2 Loans.

## Count One (Taxable Year Ended December 31, 1998)

290.    Plaintiff hereby incorporates and repeats and realleges as if fully stated herein each of the allegations of paragraphs 1 through 289.

291.    On or about September 15, 1999, within the time prescribed by law, Plaintiff filed its calendar year 1998 consolidated federal income tax return on behalf of itself and the members of the Altria consolidated group with the Internal Revenue Service Center in Holtsville, New York. The taxpayer identification number shown on the return was 13-3260245.

292.    Payments in respect of Plaintiff's income tax liability for calendar year 1998 as shown on its consolidated federal income tax return were made within the time prescribed by law on or about the following dates and in the following amounts:

Date of Payment                                                             Amount

- 61 -

| | |
|---|---|
| March 15, 1998 (credit elect overpayment applied from 1997 taxable year) | $  126,017,336 |
| Estimated Tax Payments in 1998 | $1,240,000,000 |
| Tax Deposited with Form 7004 | $65,000,000 |
| Overpayment from 1996 Audit | $31,198,893 |
| Total | $1,462,216,229 |

293.    The Internal Revenue Service ("IRS") caused an examination of Plaintiff's return for its 1998 taxable year. The IRS made certain adjustments to various items of income and expense that produced an income tax deficiency for Plaintiff's 1998 taxable year.

294.    On June 27, 2006, Plaintiff paid the entire amount of the claimed deficiency, through application of a portion of its overpayment from the 1996 taxable year.

295.    On July 11, 2006, Plaintiff filed a Form 1120X amended federal income tax return for 1998 with the Internal Revenue Service Center, Ogden, Utah, claiming a refund in the amount of $42,354,829 in tax that had been paid or credited for that year. This refund claim resulted from the erroneous treatment by the IRS of the items of income and expense described in paragraphs 1-289 above.

296.    On August 23, 2006, the IRS disallowed Plaintiff's 1998 claim for refund.

297.    Plaintiff has made no assignment of its claim for refund. Although payment thereof has been demanded, no part of the sum of $42,354,829 has been credited, remitted, or paid to Plaintiff or to anyone on its account.

## Count Two (Taxable Year Ended December 31, 1999)

298.    Plaintiff hereby incorporates and repeats and realleges as if fully stated herein each of the allegations of paragraphs 1 through 297.

299.   On or about September 15, 2000, within the time prescribed by law, Plaintiff filed its calendar year 1999 consolidated federal income tax return on behalf of itself and the members of the Altria consolidated group with the Internal Revenue Service Center in Holtsville, New York. The taxpayer identification number shown on the return was 13-3260245.

300.   Payments in respect of Plaintiff's income tax liability for calendar year 1999 as shown on its consolidated federal income tax return were made within the time prescribed by law on or about the following dates and in the following amounts:

| Date of Payment | Amount |
| --- | --- |
| March 15, 1999 (credit elect overpayment applied from 1998 taxable year) | $ 150,831,760 |
| Estimated Tax Payments in 1999 | $ 2,527,000,000 |
| Overpayment from 1996 Audit | $ 56,302,987 |
| Total | $2,734,134,747 |

301.   The IRS caused an examination of Plaintiff's returns for its 1999 taxable year. The IRS made certain adjustments to various items of income and expense that produced an income tax deficiency for Plaintiff's 1999 taxable year.

302.   On June 27, 2006, Plaintiff paid the entire amount of the claimed 1999 income tax deficiencies, through application of a portion of its overpayment from its 1996 taxable year.

303.   On July 11, 2006, Plaintiff filed a Form 1120X amended federal income tax return for 1999 with the Internal Revenue Service Center, Ogden, Utah, claiming a refund of $60,910,972 in tax that had been paid or credited for that year. This refund claim resulted from the erroneous treatment by the IRS of the items of income and expense described in paragraphs 1-289 above.

304.    On August 23, 2006, the IRS disallowed Plaintiff's 1999 claim for refund.

305.    Plaintiff has made no assignment of its claim for refund.  Although payment thereof has been demanded, no part of the sum of $60,910,972 has been credited, remitted, or paid to plaintiff or to anyone on its account.

WHEREFORE, plaintiff prays for judgment in its favor against the defendant, the United States of America, in the amount of $103,265,801, or such other amount as this Honorable Court may determine, together with interest thereon as provided by law, plus the costs of this action, and for such other relief as is just and proper.

Respectfully submitted,

Dated: March 27, 2008

Lawrence A. Dany III (LD1190)
SUTHERLAND ASBILL & BRENNAN LLP
1114 Avenue of the Americas, 40th Floor
New York, New York 10036
Phone: 212.389.5000
Fax: 212.389.5099

Counsel for Plaintiff
Altria Group, Inc.

Of Counsel

Kent L. Jones
Jerome B. Libin
Clifford E. Muller
Daniel H. Schlueter
Mary E. Monahan
David A. Roby, Jr.
Victoria A. O'Connor
Troy L. Olsen
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-0100
FAX (202) 637-3593